## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |
|---|---|
| CATHERINE VERDONE,<br><br>    Plaintiff,<br><br>  v.<br><br>RICE AND RICE, PC d/b/a RICE AND QUATTRONE, P.C., CTARP LLC, NANCY RICE, PAMELA QUATTRONE, *et al.*,<br><br>    Defendants. | Civil No. 23-cv-04224 (RMB/AMD)<br><br>**OPINION** |

**RENÉE MARIE BUMB, Chief United States District Judge:**

Sibling squabbles can get downright nasty.  In this case, Plaintiff Catherine Verdone (Verdone) claims her sister (and former employer) Defendant Nancy Rice (Rice), Rice's law firm, Defendant Rice and Rice, PC d/b/a Rice and Quattrone, P.C. (the Law Firm), Rice's law firm partner, Defendant Pamela Quattrone (Quattrone), and Rice's real estate holding company, Defendant CTARP, LLC (CTARP), breached an alleged retirement agreement to provide Verdone with income from CTARP's net profits when she retires.  On top of that, Verdone claims that when she complained to Rice and Quattrone about, among other things, Rice's alleged refusal to honor that agreement and a Law Firm accounting practice she believed violated the tax code, Rice and Quattrone fired her from the Law Firm—a job she held for over eighteen years.

Shortly after Verdone sued Defendants in New Jersey state court for breach of contract and whistle-blower retaliation under New Jersey's Conscientious Employee Protection Act (CEPA), Defendants removed this action claiming this Court has federal question and

diversity jurisdiction over Verdone's state-law claims.  They contend Verdone's claims about the so-called retirement agreement are really a claim for benefits under the Employee Retirement Income Security Act of 1974 (ERISA) disguised as state-law claims.  They also argue Verdone fraudulently joined the Law Firm, CTARP, and Quattrone to prevent removal.  After removing this case, Defendants moved to dismiss Verdone's claims.  Verdone countered, asking this Court to send her case back to state court and sanction Defendants.  She claims ERISA does not apply to the retirement agreement, and Defendants have not shouldered their burden to establish fraudulent joinder.

This Court agrees with Verdone.  Defendants have failed to show ERISA applies to the retirement agreement, and because several Defendants are New Jersey citizens, the forum defendant rule barred them from removing this action.  Defendants have not carried their heavy burden to show fraudulent joinder to overcome the forum defendant rule.  Thus, the Court **GRANTS**, **in part**, and **DENIES**, **in part**, Verdone's motion to remand and for sanctions, and **DENIES** Defendants' motion to dismiss as moot.   The parties will have to resolve this dispute in state court.

## I.  BACKGROUND

### A. The Law Firm, CTARP, and the Retirement Agreement

Verdone and Rice are sisters.  [Notice of Removal ¶ 1, Ex. A, ¶ 9 (Compl.) (Docket No. 1).]  Rice is also a lawyer who, with the help of Verdone, established the Law Firm.  [*Id.*]  Verdone worked for the Law Firm for about twenty years as a client coordinator and billing supervisor.  [Compl. ¶ 10.]  Quattrone eventually became a law partner at the Law Firm.  [*Id.* ¶ 5.]

Sometime in 2011, Rice established CTARP, which is short for "College Tuition and Retirement Plan." [*Id.* ¶¶ 14-15.] According to Verdone, Rice created CTARP "to provide tuition assistance and retirement income" to the Law Firm's employees, "namely [Rice and Verdone]." [*Id.* ¶ 16.] CTARP is a real estate holding company, and in 2011, acquired an office condo called Suite F. [*Id.* ¶ 17.] The Law Firm uses Suite F, and CTARP is the Law Firm's landlord. [*Id.* ¶ 18.]

A few years later, Rice invited Verdone to invest in CTARP so the company could acquire another office condo in the same building called Suite A. [*Id.* ¶¶ 21-23.] Verdone and her husband invested $40,000 in CTARP. [*Id.* ¶ 24.] According to Verdone, Rice agreed to give Verdone a 35% interest in the profits derived from "CTARP's real estate portfolio upon her retirement" (the Retirement Agreement). [*Id.* ¶ 24.] But Verdone and Rice never put the Retirement Agreement in writing. [*Id.* ¶ 27.] Verdone again invested in CTARP a few years later when Rice asked her for $3,000 to pay property taxes on Suite A. [*Id.* ¶ 26.] Verdone claims that Rice treated her as a partner in CTARP, and points out that Rice often referred to her as a "business partner," told Verdone to tell a lessee for one of CTARP's condos that she was a partner in CTARP, and asked her to arrange CTARP's leases and communicate with its lessees. [*Id.* ¶¶ 51-53.]

Several years after Verdone's and her husband's first investment, Rice told Verdone that she wanted to retire sooner than originally planned. [*Id.* ¶ 28.] According to Verdone, Quattrone would "buy out" Rice from the Law Firm and eventually control it. [*Id.* ¶ 29.] Given Rice's plan to retire early, Verdone asked Rice to confirm the oral Retirement Agreement in writing about Verdone's investment in CTARP. [*Id.* ¶ 30.] Rice agreed, and sent this email to Verdone:

3

Cathy@RiceElderLaw.com

| | |
|---|---|
| **From:** | Nancy M. Rice, Esq. |
| **Sent:** | Sunday, April 11, 2021 5:16 PM |
| **To:** | Cathy@RiceElderLaw.com |
| **Subject:** | CTARP |

Suite A sale:   350,000 less realtor commission (6%) and 5k closing costs = 324k
                 LBB loan payoff approx 228k = $96,000 net proceeds (not sure about cap gain)

N x 65% = $62k less cap gain tax

C x 35% = $33,600 (return on 25k in 2014 = 5% simple but AFTER TAX)
                 CV maintains 35% interest in Suite F ($450k – 278k = 172k x 35% = $60,000 after 33k
distribution; net investment = $18k = 60k

If I re-structure rent on Suite F (details to follow), we should see net income of about $3,600/mo. now; your
35% would be about $1,260/mo.  I think I will change the corp records after the sale so that your 35% of
income gets reported to you, mine to me.

When you retire, I am likely to shift CTARP 100% to you so you should be looking at about $3,600/mo. in
"unearned" income (so you can take early Soc. Sec.)

You can give Tom the $33,600, not a bad return after tax

[*Id.* ¶ 31.]

According to the email, CTARP would sell Suite A with Rice keeping 65% of the net proceeds (about $62,000) for herself, and Verdone receiving 35% of the proceeds (about $33,600).  [*Id.* ¶ 34.]  Rice suggested Verdone give her proceeds to her husband, which according to Rice, "was not a bad return after tax."  [*Id.* ¶ 35.]  Rice told Verdone that CTARP's remaining asset (Suite F) would generate about $3,600 a month in net income with Verdone receiving 35% of it (about $1,260 a month).  [*Id.* ¶ 36.]  Rice then added she would "likely" shift 100% ownership interest in CTARP to Verdone when Verdone retires so she could receive about $3,600 a month in "unearned income."  [*Id.* ¶ 37.]  According to Verdone, the email "accurately reflected" the oral Retirement Agreement that Verdone, Rice, and CTARP made years earlier.  [*Id.* ¶ 35.]

But then everything changed.  Quattrone "was not onboard" and refused to continue the Law Firm's lease with CTARP at the rent price that CTARP wanted for Suite F.  [*Id.* ¶¶ 39-40.]  And Quattrone threatened to move the Law Firm out of CTARP's condo.  [*Id.* ¶ 41.]

4

According to Verdone, Quattrone's resistance to continuing the lease with CTARP prompted Rice to try to renegotiate the Retirement Agreement because business with CTARP "could get ugly (no rent)." [*Id.* ¶ 42.] Rice emailed Verdone explaining that she was "inclined to buy [her] out." [*Id.*] Rice proposed giving Verdone 68% of the net proceeds of Suite A's sale "instead of a 35% interest in the sale of Suite A and the income stream and eventual sale of Suite F." [*Id.* ¶ 43.] In that email, Rice confirms Verdone's $43,000 contribution to CTARP. [*Id.* ¶ 42 ("CV total contribs [sic] to Suite A:  $43K").] Verdone did not agree to Rice's new terms, and insisted on following the Retirement Agreement. [*Id.* ¶ 44.]

Rice later responded to Verdone, claiming that Verdone's $43,000 investment was "a loan," and the Retirement Agreement "was an illustration of what it would look like if [she] treated [Rice] as an owner, rather than a lender." [*Id.* ¶¶ 45-46 (first alteration in original).] Rice added:

> I am not comfortable with this approach now because:  (1) Business partners need to communicate and we are not communicating.  (2) I would need to make you a co-owner of [CTARP] and do not want to be a partner with Tom (Verdone's husband) if something happens to you.  (3) I do not want to continue worrying about the management of CTARP and so want to structure a lease/purchase with [Quattrone] for Suite F.

[*Id.* ¶ 47.] Rice also clarified that her statement in the email on the Retirement Agreement about giving Verdone 100% interest in CTARP when Verdone retired was about giving her sister a gift—nothing more. [*Id.* ¶ 48.] Rice then gave Verdone three options:  (1) Rice would pay Verdone a one-time payment of $72,650 in November 2022, which represents the principal amount of the loan ($43,000) plus interest on it ($29,600); (2) Rice would allow the loan to accumulate until Verdone retires and then Rice would pay Verdone $1,100 a month for ten years, totaling over $133,000 to Verdone; or (3) Rice would pay Verdone $75,000 when

CTARP sells Suite A.  [*Id.* ¶ 54.]   Verdone refused those options, insisting on following the Retirement Agreement.  [*Id.* ¶ 58.]

Rice's and Verdone's relationship began to sour, and Rice continued to offer to cash out Verdone from CTARP.  [*Id.* ¶¶ 59-61.]  But Verdone continued to insist on following the agreed upon terms of the Retirement Agreement.  [*Id.* ¶ 62.]  Ultimately, Verdone tried to discuss the Retirement Agreement with Quattrone who, to Verdone's surprise, knew nothing about Verdone's investment in CTARP.  [*Id.* ¶¶ 63-64.]  When Verdone offered to show Quattrone the email on the Retirement Agreement, Quattrone refused.  [*Id.* ¶ 66.]  Verdone then emailed Rice (and copied Quattrone on a few of them) telling Rice that she wanted to follow the agreed upon terms of the Retirement Agreement, and asked Rice to confirm that she would honor that agreement.  [*Id.* ¶¶ 73, 75-79.]  Verdone also blind copied her husband and "two confidants" on the emails she sent to Rice.  [*Id.* ¶ 76.]  Rice never responded to Verdone's emails.  [*Id.* ¶¶ 74, 80.]

## B.  Verdone's Employment at the Law Firm

Meanwhile, Verdone's employment conditions at the Law Firm began to suffer at Rice's hands.  [*Id.* ¶¶ 88-108.]  According to Verdone, Rice would call her on the telephone and "angrily" hang up the phone each time over scheduling matters, cancelled appointments, and an overdrawn bank account.  [*Id.* ¶¶ 93-97, 99-102.]  Rice threatened to demote Verdone and even terminate her.  [*Id.* ¶¶ 98, 103.]   She also "personally attacked" Verdone.  [*Id.* ¶ 105.]

Around the same time, Verdone questioned the Law Firm's billing and accounting practices.  [*Id.* ¶¶ 81-87.]  Verdone claims the Law Firm settled a case for a client and received about $110,000 as a contingent fee.  [*Id.* ¶¶ 81-82.]  Both Rice and Quattrone instructed

Verdone not to transfer the contingent fee from the Law Firm's trust account to its operating account.  [*Id.* ¶ 83.]  When Verdone questioned Rice and Quattrone on why the money was being held in trust until 2023 and not being disbursed in 2022, Rice and Quattrone told her they did not want the Law Firm to be taxed on the money for the 2022 fiscal year.  [*Id.* ¶ 84.] Verdone believed this accounting practice violated the Internal Revenue Code's provision on receipt of income.  [*Id.* ¶¶ 85-86 (citing 26 CFR § 1.451-2).]   In January 2023, Quattrone directed Verdone to transfer the fee from the Law Firm's trust account to its "money market" account.  [*Id.* ¶ 84.]

Eventually, Verdone complained to Quattrone about Rice's conduct towards her, claiming Rice "was creating a hostile work environment and retaliating against her."  [*Id.* ¶ 110.]  According to Verdone, Rice "embarked on weeks of ceaseless attacks on [Verdone] in pure retaliation for her questions about [Rice's] business and accounting practices."  [*Id.* ¶ 115.]  But Quattrone did nothing about Rice's conduct claiming "she 'doesn't want to get in the middle of a fight.'"  [*Id.* ¶¶ 112-13.]

**C. Verdone's Termination from the Law Firm**

Things finally came to a head about two weeks after Verdone emailed Rice and Quattrone asking Rice to confirm the Retirement Agreement.  [*Id.* ¶ 116.]  According to Verdone, she accessed her work email account and discovered someone had opened an email. [*Id.*]  Verdone believed the Law Firm was undergoing a security breach, and when she tried to check the firm's bank accounts online, her access was denied.  [*Id.* ¶¶ 116-17.]  Verdone then notified Quattrone about the potential security breach who, according to Verdone, "seemed unconcerned."  [*Id.* ¶¶ 116-17.]   Hours later, Verdone lost access to her work email account and "her computer and work phone were shut down and wiped cleaned" and all her

passwords "were changed." [*Id.* ¶ 123.] When Verdone notified Quattrone a second time of the potential security breach, Quattrone told her she needs "to call" Rice. [*Id.* ¶¶ 124-25.]

Verdone eventually spoke to Rice who told her she needed "to go on leave so an 'investigation' could be conducted." [*Id.* ¶ 129.] But then Rice told Verdone she was "effectively terminated." [*Id.*] Rice asserted Verdone had missed many of Rice's phone calls and had "blind copied 'dozens' of people on an email sent from [her] work account." [*Id.* ¶ 130.] During their call, Rice "made clear" she was terminating Verdone because she complained to Quattrone about Rice's conduct, explaining Verdone made "allegations of everything from harassment to fraud so let's not pretend everything's ok. It's not." [*Id.* ¶¶ 135-36.]

Following her termination, Verdone wrote to Rice and Quattrone explaining no one provided any proof supporting the reasons for her termination (the missed phone calls). [*Id.* ¶¶ 146-47.] She also claimed the Law Firm's environment had become "clearly dishonest and lacking any semblance of professionalism or good faith by either of you." [*Id.* ¶ 148.] Rice and Quattrone responded, claiming Verdone had used the Law Firm's email account "to make allegations of harassment and fraud." [*Id.* ¶ 152.] They added, "We cannot continue to allow you to communicate with clients on our behalf and cannot trust you with confidential information when you insist on using the firm email . . . to accuse [them] of such conduct." [*Id.* ¶ 151.]

### D. Rice and Quattrone Interfere with Verdone's Application for Unemployment Benefits

After her termination, Verdone applied for unemployment benefits in Illinois, her home state. [*Id.* ¶ 153.] Verdone claims Quattrone told the state employment officials that Rice had not been fired, which, according to Verdone, caused her benefits application to be

denied.  [*Id.* ¶¶ 154-56.]  However, the employment officials eventually learned that Verdone had been fired.  [*Id.* ¶ 157.]  According to Verdone, Quattrone then changed her story and told the officials the Law Firm terminated Verdone's employment for misconduct because she used "her company email for personal purposes and add[ed] personal contact to emails with confidential company information."  [*Id.*]

Verdone appealed the employment officials' decision to deny her benefits, and on appeal, Rice told officials Verdone had resigned and engaged in "misconduct" while employed at the Law Firm.  [*Id.* ¶¶ 160-63.]  Verdone claims that because Rice and Quattrone lied about the reasons for her termination, the state officials denied her application for unemployment benefits.  [*Id.* ¶¶ 158-59, 164.]

### E.  Verdone's Lawsuit and the Pending Motions

Verdone then sued Rice, Quattrone, the Law Firm, and CTARP in New Jersey state court raising claims ranging from whistle-blower retaliation under CEPA to anticipatory repudiation of the Retirement Agreement to unjust enrichment.  [*See generally* Compl.]  For her CEPA claim, Verdone claims the Law Firm, Rice, and Quattrone terminated her in retaliation for her complaints about the Law Firm's accounting practices and "deceit" regarding the Retirement Agreement—that is, her 35% interest in CTARP's net profits.  [*Id.*]  She also brings anticipatory breach and repudiation of contract claims against CTARP and Rice because Rice allegedly refuses to honor the Retirement Agreement, and attempted to renegotiate it several times over Verdone's objections.  [*Id.*]  Finally, she claims Rice and CTARP have been unjustly enriched at her expense.  [*Id.*]

Defendants removed this action, claiming the Court has federal question and diversity jurisdiction.  [Notice of Removal ¶ 4.]  Defendants contend Verdone's claims about the

Retirement Agreement fall within Section 502 of ERISA because the alleged agreement qualifies as an employee benefit plan under ERISA, and thus, under the complete preemption doctrine, this Court has exclusive jurisdiction over those claims.  [*Id.* ¶¶ 39-50.]  Next, they claim this Court has diversity jurisdiction and the forum defendant rule does not prohibit removal because Verdone's claims against the New Jersey defendants are baseless.  [*Id.* ¶¶ 51-63.]

After defendants removed this action, both parties filed premotion letters required by this Court's individual rules and procedures requesting a premotion conference to seek leave to file separate motions (a motion to remand by Verdone, and a motion to dismiss by Defendants).  [Docket Nos. 4-5.]  The Court declined to hold a premotion conference, allowing the parties to pursue their desired motions.  [Docket No. 8.]

Defendants then moved to dismiss Verdone's Complaint, arguing she failed to state a claim upon which relief can be granted and that ERISA preempted her claims relating to the Retirement Agreement.  [Docket No. 9.]  Verdone then moved to remand this matter to state court and for sanctions.  [Docket No. 10.]  Verdone argues Defendants improperly removed this action because:  (1) the Court lacks federal question jurisdiction since ERISA does not apply to the Retirement Agreement; and (2) the forum defendant rule bars Defendants from removing this action because the Law Firm, Quattrone, and CTARP are New Jersey citizens, and Verdone filed this action in New Jersey state court.  [*Id.*]

## II. DISCUSSION

### A. Verdone's Motion to Remand

Because Verdone challenges this Court's jurisdiction, the Court must first address her motion to remand.  *Christ Hosp. v. Local 1102 Health & Ben. Fund*, 2011 WL 5042062, at *2

(D.N.J. Oct. 24, 2011) (considering motion to remand first because the motion "affects this Court's subject matter jurisdiction"); *see also Newton v. S. Jersey Paper Products Co.,* 2020 WL 2059954, at *2 (D.N.J. Apr. 29, 2020) ("Though Defendant's motion to dismiss came earlier in time than Plaintiff's motion to remand, the Court is obligated to consider Plaintiff's motion to remand first."). Indeed, federal courts must always ensure they have jurisdiction over a dispute. *Ibrahim v. Wells Fargo Bank, N.A.*, 2020 WL 4251477, at *1 (D.N.J. July 24, 2020) ("Federal courts are courts of limited jurisdiction and have an obligation to establish subject matter jurisdiction . . . . (citing *Liberty Mut. Ins. Co. v. Ward Trucking Co.*, 48 F.3d 742, 750 (3d Cir. 1995))).

28 U.S.C. § 1441(a) allows a defendant to remove an action filed in a state court to a federal court that would have had original jurisdiction over the action. Federal courts have original jurisdiction over lawsuits presenting a federal question—that is, the plaintiff's claims arise under federal law, 28 U.S.C. § 1331—or lawsuits among diverse citizens—meaning, lawsuits involving citizens from different states where the amount of controversy exceeds $75,000, 28 U.S.C. § 1332. When a plaintiff moves for a remand to state court, the removing party must show removal was proper. *Stephens v. Gentilello*, 853 F. Supp. 2d 462, 465 (D.N.J. 2012) ("As the party removing the case, the defendant has the burden to prove that federal court jurisdiction is proper at all stages of the litigation."). "Removal statutes 'are to be strictly construed against removal and all doubts should be resolved in favor of remand.'" *City of Hoboken v. Exxon Mobil Corp.*, 558 F. Supp. 3d 191, 198 (D.N.J. 2021) (quoting *Batoff v. State Farm Ins.,* 977 F.3d 848, 851 (3d Cir. 1992)). When deciding a motion to remand, courts assume as true "all factual allegations of the complaint." *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987).

Defendants removed Verdone's lawsuit to this Court claiming this Court has both federal question and diversity jurisdiction.  [Notice of Removal ¶ 4; *see also* Defs.' Mem. of Law in Opp'n to Pl.'s Mot. to Remand 22-51 (Defs.' Opp'n Br.) (Docket No. 11).]  This Court disagrees.

### 1.  Federal Question Jurisdiction under ERISA

To invoke federal question jurisdiction, the removing party must show a federal claim exists on the face of the plaintiff's complaint.  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207 (2004).  "[P]laintiffs are the master[s] of the[ir] claim[s] . . . and may avoid federal jurisdiction by exclusive reliance on state law."  *City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 707 (3d Cir. 2022) (alterations in original) (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987)).  But sometimes, federal courts recast a plaintiff's "state law claim as a federal law claim removable to [federal] court."  *Id.* (alteration in original) (quoting *Goepel v. Nat'l Postal Mail Handlers Union*, 36 F.3d 306, 312 (3d Cir. 1994)).  The complete preemption doctrine grants courts this power and applies when "a federal statute wholly displaces the state-law cause of action."  *Caggiano v. Prudential Ins. Co. of. Am.*, 2021 WL 1050166, at *3 (D.N.J. Mar. 19, 2021) (citation and internal quotation marks omitted).  "When the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law."  *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8 (2003).  The complete preemption doctrine gives federal courts subject matter jurisdiction.  *Id.* (explaining a claim that is completely preempted by federal law is "removable" to federal court).

"ERISA's civil enforcement mechanism, Section 502(a), 'is one of those provisions with such extraordinary preemptive power that it converts an ordinary state common law

complaint into one stating a federal claim for purposes of the well-pleaded complaint rule' and permits removal." *Atl. ER Physicians Team, Pediatrics Assoc., PA v. United Health Group, Inc.*, 2021 WL 4473117, at *2 (D.N.J. Sept. 30, 2021) (quoting *N.J. Carpenters & the Trs. Thereof v. Tishman Constr. Corp. of N.J.,* 760 F.3d 297, 303 (3d Cir. 2014)).   To determine whether ERISA's complete preemption applies, courts must find:  (1) the plaintiff could have brought the claim under Section 502(a) of ERISA, and (2) no other independent duty supports the plaintiff's claim.  *Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 400 (3d Cir. 2004).  A removing defendant must show the plaintiff's state-law claim satisfies both those requirements.  *N.J. Carpenters*, 760 F.3d at 303.   To see if the plaintiff could have brought a Section 502(a) claim, courts examine whether:  (1) "the plaintiff is the type of party that can bring a claim pursuant to Section 502(a)(1)(B)," and (2) "the actual claim that the plaintiff asserts can be construed as a colorable claim for benefits pursuant to Section 502(a)(1)(B)."  *Atl. ER Physicians Team,* 2021 WL 4473117, at *3 (emphasis removed, citation and internal quotation marks omitted).

Section 502(a)(1)(B) allows a beneficiary or participant to a bring a civil action to recover benefits due under an employee benefit plan.  29 U.S.C. § 1132(a)(1)(B).   To prevail on a Section 502(a)(1)(B) claim, a plaintiff must show:  "(1) the plan is covered by ERISA; (2) the plaintiff is a participant or beneficiary of the plan; and (3) the plaintiff was wrongfully denied a benefit owed under the plan."  *Emami v. Empire Healthchoice Assurance, Inc.*, 2019 WL 4597521, at *6 (D.N.J. Sept. 20, 2019) (quoting *Guerrero v. FJC Sec. Servs. Inc.*, 423 F. App'x 14, 16 (2d Cir. 2011)); *see also Colarusso v. Transcapital Fiscal Sys., Inc.*, 227 F. Supp.2d 243, 250 (D.N.J. Aug. 27, 2002).

### (1) The Retirement Agreement is not an ERISA benefit plan

"ERISA applies to 'any employee benefit plan if it is established or maintained . . . by any employer engaged in commerce.'" *Deibler v. United Food & Com. Workers' Local Union 23*, 973 F.2d 206, 209 (3d Cir. 1992) (omission in original) (quoting 29 U.S.C. § 1002(3)).  While "ERISA requires employers to establish benefit plans through a written instrument, . . . courts have concluded that ERISA plans may exist even with the absence of a written summary plan document." *Mance v. Quest Diagnostics Inc. Voluntary Separation Agreement Plan*, 237 F. Supp. 3d 217, 222 (D.N.J. 2017) (citations omitted); *see also Shaver v. Siemens Corp.*, 670 F.3d 462, 475 (3d Cir. 2012) (noting informal written or oral communications could establish an ERISA benefit plan).

An ERISA plan "is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Woerner v. Fram Grp. Operations, LLC*, 658 F. App'x 90, 95 (3d Cir. 2016) (quoting *Shaver*, 670 F.3d at 475).  "The 'crucial factor' in determining whether a 'plan' has been established is 'whether the employer has expressed an intention to provide benefits on a regular and long-term basis.'" *Menkes v. Prudential Ins. Co. of Am.*, 762 F.3d 285, 290 (3d Cir. 2014) (quoting *Gruber v. Hubbard Bert Karle Weber, Inc.*, 159 F.3d 780, 789 (3d Cir. 1998)).

To determine whether an informal plan exists, courts should first look to any "written representations" the putative sponsor made "to its employees over the course of their employment." *Mance*, 237 F. Supp. 3d at 223 (quoting *Henglein v. Informal Plan for Plan Shutdown Benefits for Salaried Emps.*, 974 F.2d 391, 400 (3d Cir. 1992)).  If written representations are lacking or they "do not clearly limit benefits," courts must "consider all .

14

. . evidence that would indicate the presence or absence of an informal employee benefit plan," like:

> internal or distributed documents, oral representations, existence of a fund or account to pay benefits, actual payment of benefits, a deliberate failure to correct known perceptions of a plan's existence, the reasonable understanding of employees, and the intentions of the putative sponsor.

*Henglein*, 974 F.2d at 400.  That information "would all be relevant to determine whether a plan existed." *Id.*

On top of that, courts must look to the existence of an "ongoing administrative scheme" in "which the plan administrator must set up in order to determine eligibility for benefits." *Menkes*, 762 F.3d at 290 (quoting *Shaver*, 670 F.3d at 476); *see also Coggins v. Keystone Foods, LLC*, 111 F. Supp. 3d 630, 638-39 (E.D. Pa. 2015) (explaining "for ERISA to apply some new administrative framework is necessary," and ruling "Retirement Agreements" providing retirees with reimbursement for certain out-of-pocket medical expenses not an ERISA plan because agreements did not create administrative scheme).  This required "administrative scheme 'may arise where the employer, to determine the employee's eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria.'"  *Shaver*, 670 F.3d at 477 (quoting *Kulinski v. Medtronic Bio-Medicus, Inc.*, 21 F.3d 254, 257 (8th Cir. 1994)).  "Simple or mechanical determinations, however, do not create an administrative scheme." *Mance*, 237 F. Supp. 3d at 223.  So to determine whether an ongoing administrative scheme exists, courts must look to "whether the plan requires 'ongoing, particularized, administrative, analysis' for each employee, and if 'a reasonable employee would perceive an ongoing commitment by the employer to provide some employee benefits.'"  *Id.* (quoting *Shaver*, 670 F.3d at 477).

To start, accepting the Complaint's allegations as true, *see Steel Valley*, 809 F.2d at 1010, Verdone alleges some facts suggesting Rice created an ERISA retirement plan for Verdone's benefit.  For example, Rice is the Law Firm's managing shareholder and CTARP's sole member.  [Compl. ¶ 4.]  According to Verdone, Rice created CTARP "to provide tuition assistance and retirement income" to the Law Firm's employees, specifically, Verdone and Rice.  [*Id.* ¶¶ 14-16.]  Although the parties use different labels (investment, loan), Verdone contributed to CTARP in exchange for Rice's promise to pay her 35% of the CTARP's net profits when she retired.  [*Id.* ¶¶ 24-25.]  Employees often contribute to their employer sponsored retirement plans that fall within ERISA.  Thus, Verdone's Complaint suggests Rice orally created an employer sponsored retirement plan for Verdone.  Indeed, "[a]n employer . . . can establish an ERISA plan rather easily."  *Woerner*, 658 F. App'x at 95 (quoting *Gruber*, 159 F.3d at 789).

But that does not end the matter.  Because an employer can informally create an ERISA plan through an oral representation, the Court must examine what a reasonable person could glean from the "surrounding circumstances" about the plan.  *Shaver*, 670 F.3d at 475.  Normally, courts first look to any written plan documents.  *Henglein*, 974 F.2d at 400.  Yet where, as here, there are no plan documents, courts must look to "all . . . evidence that would indicate the presence or absence of an informal employee benefit plan."  *Id.*  Here, based on the Retirement Agreement and the email about it, a reasonable person "could ascertain the intended benefits, a class of beneficiaries, [and] the source of financing."  *Woerner*, 658 F. App'x at 95 (quoting *Shaver*, 670 F.3d at 475).  Indeed, a reasonable person could find that CTARP's income derived from the rents of its properties to be the source of

16

financing for the plan, Verdone and Rice are the plan beneficiaries, and the right to receive a percentage of CTARP's net profits to be the intended benefits of the plan.

Still, this so-called retirement plan falls outside ERISA. Indeed, given Verdone's allegations, no reasonable person could ascertain the procedures for receiving the benefits under the Retirement Agreement. *Mance*, 237 F. Supp. 3d at 227-28 (ruling employer did not create an ERISA plan because, among other reasons, a reasonable person could not "ascertain the process for requesting benefits"). Verdone's Complaint, including allegations on the Retirement Agreement and the email confirming it, provides no information on the procedure for obtaining the post-retirement income. *See Fannaly v. LEI, Inc.*, 488 F. Supp. 3d 450, 458 (E.D. La. 2020) (ruling stock plan not an ERISA plan and remanding matter to state court because, among other reasons, a reasonable person could not figure out procedures for obtaining benefit). Indeed, the Complaint contains no allegations on how the retirement income would be paid to Verdone. *See Anastos v. IKEA Prop., Inc.*, 634 F. Supp. 3d 1305, 1317 (N.D. Ga. 2022) (finding policy to provide retirees with "non-financial benefits" not an ERISA plan because, among other reasons, policy did not explain how benefits would be paid or the claim process); *see also Frommer v. Celanese Corp.*, 2007 WL 3408275, at *3-4 (D.N.J. Nov. 15, 2007) (dismissing ERISA claim because plaintiff's complaint contained no allegation to determine, among other things, the procedures for receiving benefits under the alleged agreement).

Nor does the Complaint explain how Verdone would challenge a decision to deny her benefits. Suppose the Law Firm, assuming it's the plan sponsor, refuses to pay Verdone any money from CTARP's net profits when she retires. What is Verdone to do? Who knows because nothing in the Complaint answers that question. *See Fannaly*, 488 F. Supp. 3d at 458

17

(holding stock plan not an ERISA plan where plan did not provide any information on how to appeal the denial of benefits).

On top of those failures, the supposed retirement plan does not require an ongoing administrative program—a "touchstone[]" of any ERISA plan. *Menkes*, 762 F.2d at 290; *see also Girardot v. Chemours Co.,* 731 F. App'x 108, 111-12 (3d Cir. 2018) (concluding agreement to provide severance payments to employees not an ERISA plan because agreement did not require the creation of "a new administrative program to determine eligibility or amounts"). Accepting the Complaint's allegations as true, Verdone is to receive 35% of CTARP's net profits when she retires. [Compl. ¶ 25.] Verdone's entitlement to those funds does not involve any discretionary determination on her eligibility to receive that money. Indeed, the plan administrator needs to simply know when she retired. Once the administrator has that information, the administrator would just cut Verdone a check representing 35% of CTARP's net profits. That simple, mathematical determination is not enough to establish an ongoing administrative scheme. *Mance*, 237 F. Supp. 3d at 223; *see also Laufenberg v. Ne. Carpenters Pension Fund*, 2019 WL 6975090, at *9 (D.N.J. Dec. 19. 2019) (ruling agreement not an ERISA plan because "[p]laintiff's entitlement to the funds [did] not involve any discretionary determination" since payments were "doled out mechanically each month in an amount determined by a one-time computation"). "To do little more than write a check hardly constitutes the operation of a benefit plan[]" under ERISA. *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 12 (1987); *see also In re Joy Global, Inc.*, 346 B.R. 659, 668 (D. Del. 2006) (ruling severance payment policy to make installment payments not an ERISA plan because the procedures to calculate payment "involve little more than doing arithmetic and writing a check").

18

Setting aside the lack of an ongoing administrative program and the inability to figure out a procedure to receive benefits, Verdone's allegations also suggest the absence of an employee benefit plan. *Henglein*, 974 F.2d at 400 (instructing courts to look to, among other things, oral representations, the putative sponsor's intentions, and failure to correct known perceptions about the plan's existence). For example, following Verdone's investment in CTARP, Rice treated her as business partner in CTARP by allowing Verdone to arrange CTARP's leases and communicate with its lessees, and instructing Verdone to tell lessees that she is a partner in CTARP. [Comp. ¶¶ 51-53.] And when Quattrone threatened to move the Law Firm out of CTARP's property, Rice characterized Verdone's $40,000 contribution as a business loan, not an investment in CTARP, and attempted to renegotiate the Retirement Agreement several times. [*Id.* ¶¶ 39-62.] Rice's alleged conduct does not show an intent to provide Verdone with benefits "on a regular and long-term basis.'" *Menkes,* 762 F.3d at 290 (quoting *Gruber*, 159 F.3d at 789).

Lastly, the Retirement Agreement lacks any of the hallmarks associated with an ERISA plan. For example, ERISA requires, among other things, fiduciaries be named to control and manage the operation and administration of the plan, *see* 29 U.S.C. §§ 1102(a), 1104(a), the plan procedures for amending it, *see id.* § 1102(b), and that the plan's assets be held in trust, *see id.* § 1103(a). Nothing in Verdone's Complaint provides any information on these statutory requirements. *See Lowney v. Genrad, Inc.*, 925 F. Supp. 40, 46 (D. Mass. 1995) (finding employer's agreement to pay former employee the same amount of retirement benefits he would have received under employer's voluntary retirement program not an ERISA plan because agreement did "not establish an on-going administrative scheme and [did] not bear the marks normally associated with the creation and maintenance of an ERISA

plan"). Defendants' request for removal based on ERISA's complete preemption has a lot of blanks that they have not filled in.

All and all, the Retirement Agreement does not qualify as an ERISA plan because no reasonable person can ascertain the procedures for receiving benefits and the so-called plan does not require an ongoing administrative scheme. Because there is no ERISA plan, ERISA's complete preemption does not apply, and therefore, this Court lacks federal question jurisdiction. *Fannaly*, 488 F. Supp. 3d at 458-59.

### 2. Diversity Jurisdiction

Still, Defendants press on, arguing this Court has diversity jurisdiction over Verdone's claims. [Notice of Removal ¶ 4.] For diversity jurisdiction to apply, "no party can be a citizen of the same state as any opposing party." *Peace Church Risk Retention Grp. V. Johnson Controls Fire Prot. LP*, 49 F.4th 866, 870 (3d Cir. 2022). Here, Verdone (an Illinois citizen) is diverse from all Defendants because Rice is a Florida citizen, and Quattrone, the Law Firm, and CTARP are New Jersey citizens. [Compl. ¶¶ 1-5.]

But when a defendant seeks removal based on diversity jurisdiction, the forum defendant rule bars removal where any of one of the defendants is citizen of the State where the plaintiff filed the state court litigation. 29 U.S.C. § 1441(b)(2). So under the forum defendant rule, an action filed in New Jersey state court cannot be removed to this Court if any defendant in that action is a New Jersey citizen. *Harrison v. Katsanos*, 2023 WL 8358476, at *3 (D.N.J. Nov. 29, 2023). But this rule is "procedural rather than jurisdictional," *see Encompass Ins. Co. v. Stone Mansion Rest. Inc.,* 902 F.3d 147, 152 (3d Cir. 2018), and thus can be waived if not timely asserted, *see Korea Exch. Bank, N.Y Branch v. Trackwise Sales Corp.*, 66 F.3d 46, 50-51 (3d Cir. 1995).

Defendants argue the forum defendant rule does not justify remand because:  (1) Verdone waived any defect in the removal process by not timely moving to remand; and (2) the fraudulent joinder doctrine prevents this Court from the enforcing the forum defendant rule because Verdone's claims against the New Jersey citizens are baseless.  [Defs.' Opp'n Br. at 15-17, 29-51.]

### (1) Verdone Timely Moved to Remand

A party raising the forum defendant rule to justify a remand must move to remand the action thirty days after the defendant removed the action to federal court.  29 U.S.C. § 1447(c) ("A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a)."); *see also Bank of N.Y. Mellon v. Lee*, 2016 WL 526233, at *2 (D.N.J. Feb. 9, 2016) (explaining a motion to remand based on the forum defendant rule must be filed within 30 days after the notice of removal was filed).

Under this Court's Individual Rules and Procedures, a party seeking leave to move to remand must first file a letter requesting a premotion conference explaining the reason for the motion.  Individual Rs. & Procs., Bumb, C.J., at I.A.  By those rules, a party's time to move to remand is tolled either through:  (1) the date of the premotion conference (if the Court holds one); or (2) the Court's decision not to hold the conference.  *Id.*

Defendants here removed this matter on August 8, 2023.  [Docket No. 1.]  Fourteen days later, Verdone filed her premotion conference letter on August 22nd, stopping Section 1447(c)'s thirty-day countdown.  [Docket No. 5.]  On September 6th, this Court declined to hold a premotion conference, and therefore, Section 1447(c)'s countdown resumed.  [Docket No. 8.]  Verdone then moved to remand on September 21st, within Section 1447(c)'s thirty-day

window.  [Docket No. 10.]   Thus, Verdone timely moved to remand and did not waive the forum defendant rule.

### (2) Forum Defendant Rule and the Fraudulent Joinder Doctrine

Because Quattrone, the Law Firm, and CTARP are New Jersey citizens, the forum defendant rule barred Defendants from removing this action.  § 1441(b)(2).  But the forum defendant rule will not apply if Verdone fraudulently joined those Defendants here.  *See Stiglich v. Chattem, Inc.*, 2012 WL 5403437, at *2 (D.N.J. Nov. 5, 2012).

The fraudulent joinder doctrine rests on the principle that "a court cannot permit a plaintiff to join a straw-man defendant solely to deprive removal-eligible defendants of a federal forum to which they are otherwise entitled."  *Yellen v. Teledne Cont'l Motors, Inc.*, 832 F. Supp. 2d 490, 503 (E.D. Pa. 2011).  By the doctrine, courts are allowed to "disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction."  *In re Briscoe*, 448 F.3d 201, 216 (3d Cir. 2006) (quoting *Mayes v. Rapport*, 198 F.3d 457, 461 (4th Cir. 1999)).  The removing party claiming fraudulent joinder shoulders a "heavy burden of persuasion" of showing fraud and must overcome "a very high bar" to show:

> [T]here is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendants or seek a joint judgment.

*Avenatti v. Fox News Network LLC*, 41 F.4th 125, 133 (3d Cir. 2022) (quoting *Batoff v. State Farm Ins.*, 977 F.2d 848, 851-52 (3d Cir. 1992)); *see also AC Ocean Walk, LLC v. Investors Bancorp, Inc.*, 2023 WL 8802531, at *3 (D.N.J. Dec. 20, 2023) (explaining removing defendant must show fraudulent joinder "by clear and convincing evidence").  "[I]f there is even a possibility that a state court would find that the complaint states a cause of action against any one of the

resident defendants, the federal court must find that joinder was proper and remand the case to state court." *Avenatti*, 41 F.4th at 133 (quoting *Batoff*, 977 F.2d at 851-52).

When confronted with a fraudulent joinder claim, courts "must focus on the plaintiff's complaint at the time the petition for removal was filed" and "assume as true all factual allegations of the complaint." *Batoff*, 977 F.2d at 851-52 (citation and internal quotation marks omitted). And courts "must resolve any uncertainties as to the current state of controlling substantive law in favor of the plaintiff." *Id.* (citation and internal quotation marks omitted). In doing so, courts must not make any merits determination because "it is possible that a party is not fraudulently joined, but that the claim against that party ultimately is dismissed for failure to state a claim upon which relief may be granted." *Briscoe*, 448 F.3d at 217-218 (quoting *Batoff*, 977 F.2d at 852); *see also Batoff*, 977 F.2d at 852 (explaining motion to dismiss standard under Rule 12(b)(6) does not apply to fraudulent joinder claims); *Curley v. Mercury Ins. Servs., LLC*, 2022 WL 445633, at *3 (D.N.J. Feb. 10, 2022) ("[W]hen assessing fraudulent joinder, 'it is not a district court's role . . . to scrutinize the merits of a claim,' or even to determine 'whether plaintiff's claims are 'plausible' under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), or Rule 12(b)(6)[.]'" (omission and alteration in original) (quoting *McBurnie v. CRC Ins. Servs., Inc.*, 2020 WL 1329917, at *4 (D.N.J. Mar. 23, 2020)). Rather, courts focus the fraudulent joinder inquiry on whether the plaintiff's claims against the at-home defendants are "wholly insubstantial and frivolous." *Batoff*, 977 F.2d at 852.

### (a) Defendants have not shown Verdone fraudulently joined Quattrone and the Law Firm for her CEPA claim

New Jersey's legislature enacted CEPA to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J.

2003) (quoting *Abbamott v. Piscataway Twp. Bd. of Educ.*, 650 A.2d 958, 971 (N.J. 1994)). "CEPA prohibits employers from taking retaliatory action against certain employees." *Stapleton v. DSW, Inc.*, 931 F. Supp. 2d 635, 638 (D.N.J. 2013).

To establish a *prima facie* CEPA claim, Verdone must show: (1) "she reasonably believed her employer was violating either a law or a clear mandate of public policy;" (2) "she performed a 'whistle-blowing' activity described in N.J. Stat. Ann. § 34:19–3[];" (3) "an adverse employment action was taken against her;" and (4) "a causal connection exists between the whistle-blowing activity and the adverse employment action." *Goode v. Camden City Sch. Dist.*, 2024 WL 107887, at *3 (3d Cir. Jan. 10, 2024) (citing *Lippman v. Ethicon, Inc.*, 119 A.3d 215, 226 (N.J. 2015)). Whistle-blowing activity under CEPA includes, among other things, (1) disclosing, or threatening to disclose, to a supervisor or public body an activity the employee reasonably believes violates a law, or is fraudulent or criminal; or (2) objecting to, or refusing to participate in those types of activities. N.J. Stat. Ann. § 34:19-3(a), (c). CEPA "is a remedial statute that promotes a strong public policy of [New Jersey]," and as such, courts construe the law "liberally to effectuate its important social goal." *Battaglia v. United Parcel Serv., Inc.*, 70 A.3d 602, 624 (N.J. 2013) (citation and internal quotation marks omitted).

CEPA imposes liability on employers and "individuals who perform retaliatory acts within the scope of his or her employment." *Curley*, 2022 WL 445633, at *4 (citation and internal quotation marks omitted); *see also Bowen v. Parking Auth. City of Camden*, 2003 WL 22145814, at *23 (D.N.J. Sept. 18, 2003) ("CEPA, though, will not impose liability on any employee, supervisor, commissioner, or attorney *unless* the plaintiff proves that the defendant took an adverse employment action against him because of his whistleblowing.")

24

Here, viewing Verdone's Complaint in the light most favorable to her, *see Batoff*, 977 F.2d at 851-52, this Court cannot rule out the possibility the state court would find the complaint states a CEPA claim.  *See Avenatti*, 41 F.4th at 133.   Focusing solely on Verdone's allegation about the Law Firm's accounting practice, Verdone has alleged enough facts suggesting the Law Firm retaliated against her when she questioned Rice and Verdone about their instruction not to move the contingent fee from the Firm's trust account to avoid taxes for that tax year.  [Compl. ¶¶ 81-87.]  Rice believed that practice violated the Internal Revenue Code.  [*Id.* ¶¶ 85-86.]   Verdone claims she questioned both Rice and Quattrone about this accounting practice, and was instructed to transfer the money anyway.  [*Id.*  ¶¶ 84, 87.] Around the same time, Verdone often complained to Quattrone about Rice's treatment of her, and Rice's alleged refusal to honor the Retirement Agreement.  [*Id.* ¶¶ 63-72, 109-115.] Rice and Quattrone terminated Verdone about three months after she questioned them about the accounting practice she believed violated the tax code (and about two weeks after she asked Rice to confirm the Retirement Agreement).  [*Id.* ¶¶ 81-87, 116.]   Given those allegations, this Court cannot say Verdone's CEPA claim is "wholly insubstantial and frivolous."[1]  *Batoff*, 977 F.2d at 852; *see also Annen v. Morgan Tech. Ceramics*, 2019 WL 325542, at *5 (D.N.J. Jan. 24, 2019) (explaining for defendants to meet their burden for the fraudulent

---

[1] In reaching this conclusion, the Court does not credit Verdone's allegations about Rice's and Quattrone's alleged interference with Verdone's application for unemployment benefits.  "As a matter of law, any post-employment conduct by Defendants is not actionable under CEPA."  *Knight v. Vitamin Shoppe, Inc. Executive Severance Pay Policy*, 2022 WL 3593882, at *4 (D.N.J. Aug. 23, 2022); *see also Zubrycky v. ASA Apple, Inc.*, 885 A.2d 449, 452 n.2 (N.J. Super. Ct. App. Div. 2005) (finding "no merit in plaintiff's claim that defendant violated CEPA by opposing his unemployment claim, because defendant's action occurred after plaintiff resigned, and CEPA does not apply to post-employment conduct").

joinder doctrine, "they must show that there is no possibility that New Jersey law would recognize any of the claim asserted against" them).

Defendants resist that conclusion, arguing Verdone's CEPA claim is not colorable because she has not shown:  (1) she engaged in CEPA protected conduct—that is, she blew the whistle; (2) Quattrone had any involvement in the decision to terminate her; and (3) a causal link between her alleged whistle-blowing and her termination.  [Defs.' Opp'n Br. at 34-45.]  None of those arguments help Defendants over the "very high bar for showing fraud" needed to establish fraudulent joinder.  *Avenatti*, 41 F.4th at 133.

Defendants first argue Verdone did not "blow the whistle" by merely questioning Rice and Quattrone about their instructions to not move the contingent fee from the Law Firm's trust account for tax purposes.  [Defs.' Opp'n Br. at 36-41.]  Pointing to the Court's decision in *Blackburn v. United Parcel Service*, 3 F. Supp. 2d 504 (D.N.J. 1998), Defendants argue Verdone's mere questioning about the accounting practice is not whistle-blowing.  [*Id.* at 40.]  True, in *Blackburn*, the Court granted an employer's summary judgment motion because, in that Court's view, the plaintiff did not blow the whistle within CEPA's meaning. 3 F. Supp. 2d at 517.  The Court did not find any protected whistle-blower activity because the plaintiff "merely questioned and disagreed with [employer's] pricing practices and was concerned about the potential legal impact."  *Id.*

The Third Circuit, however, questioned that ruling and affirmed the court's grant of summary judgment on another ground.  *Blackburn v. United Parcel Serv.,* 179 F.3d 81, 93 (3d Cir. 1999) (stating "we have some doubts as to the correctness of the District Court's conclusion" that plaintiff "had not shown that he had engaged in protected whistleblowing activity"); *see also id.* n.4 ("[W]e believe it is a close question whether the District Court

correctly concluded that [plaintiff's] activity was not protected whistleblowing under [CEPA], and we decline to reach this difficult issue, as our ultimate decision in this case makes it unnecessary to do so."). Thus, given the Third Circuit's treatment of the District Court's decision, this Court finds *Blackburn* unpersuasive.

In any event, "CEPA does not require any magic words in communicating an employee's reasonable belief of illegal activity." *Bonda v. City of Elizabeth*, 2019 WL 2559724, at *13 (N.J. Super. Ct. App. Div. June 21, 2019) (quoting *Beasley v. Passaic Cty.*, 873 A.2d 673, 684 (N.J. Super. Ct. App. Div. 2005)). The New Jersey Supreme Court has construed CEPA's phrase "object to" liberally because the statute is remedial. *Lippman*, 119 A.2d at 227-228. Indeed, looking to dictionary definitions, the *Lippman* court construed the word "object" in CEPA to mean "[t]o hold or present an opposing view" or "[t]o feel adverse to or express disapproval of something." *Id.* (citation and internal quotation marks omitted). Given that interpretation, Verdone's questioning of Rice's and Quattrone's accounting practice—which she believed violated the tax code—could be construed as objecting within CEPA's meaning. N.J. Stat. Ann. § 34:19-3(c).

Next, despite Defendants' contrary arguments, Verdone has alleged enough facts suggesting Quattrone personally participated in her termination. *See Bowen*, 2003 WL 22145814, at *23. Indeed, Verdone has alleged Quattrone was one of her supervisors, and she complained to her about the Law Firm's accounting practice and Rice's conduct to her. [Compl. ¶¶ 81-87, 109-115.] And Quattrone allegedly orchestrated the shutdown and lockout of Verdone from the Law Firm's technology and accounts the day Rice notified her that she was being fired. [*Id.* ¶¶ 116-141.] Further, Quattrone allegedly signed the termination letter explaining the reasons the Law Firm terminated Verdone's employment. [*Id.* ¶¶ 150-152.]

Based on those allegations, this Court cannot say the state court would not attach individual liability against Quattrone (assuming Verdone prevails on her CEPA claim).

At any rate, courts in this District have given plaintiffs in CEPA cases some leeway in pleading facts to establish individual liability. *See Curley*, 2022 WL 445633, at *5 (explaining that "in CEPA cases, courts have recognized that, [before] discovery, 'a plaintiff cannot be expected to be privy to the inner workings' of the retaliatory actions and decisions individuals made against them, and thus, have allowed plaintiffs to proceed beyond the motion to dismiss stage to discover additional information on the alleged retaliation" (quoting *Southward v. Elizabeth Bd. of Educ.*, 2017 WL 111924, at *10-11 (D.N.J. Jan. 11, 2017))); *see also Blount v. TD Bank, N.A.*, 2023 WL 4621881, at *9 (D.N.J. July 19, 2023).

Finally, Verdone's Complaint establishes a causal connection between her alleged whistle-blowing and her termination.  To determine whether a causal connection exists between a plaintiff's whistle-blower activity and the adverse employment action, courts must consider all circumstances surrounding the employment decision.  *See Maimone v. City of Atl. City*, 903 A.2d 1055, 1064 (N.J. 2006); *see also Est. of Roach v. TRW, Inc.*, 754 A.2d 544, 552 (N.J. 2000) (explaining fact finder may infer CEPA's causal connection "based on the surrounding circumstances").  "[T]emporal proximity" between the whistle-blowing activity and the adverse employment action is "one circumstance that may support an inference of a causal connection." *Maimone*, 903 A.2d at 1064.  If "temporal proximity" is not "unusually suggestive," courts must examine "whether the proffered evidence, looked at as a whole, may suffice to raise the inference of causation." *Kerrigan v. Otsuka Am. Pharm., Inc.*, 706 F. App'x 769, 772 (3d Cir. 2017) (citation and internal quotation marks omitted).  When deciding causation, courts must remember that establishing a *prima facie* CEPA case "is not onerous."

28

*Scull v. Wakenhut Corp.*, 2012 WL 1900573, at *12 (D.N.J. May 24, 2012) (citing *Neiderlander v. Am. Video Glass Co.*, 80 F. App'x 256, 261 (3d Cir. 2003)).

Defendants contend Verdone's CEPA claim is not colorable for lack of causation. [Defs.' Opp'n Br. at 44-45.] They largely focus on the temporal proximity between Verdone's alleged whistle-blowing conduct and her termination. [*Id.*] Again, looking solely on Verdone's Complaint about the Law Firm's accounting practice, it appears Rice and Verdone terminated Verdone about three months after she questioned them about not moving the contingent fee from the trust account. [*Id.* ¶¶ 81-87, 116.]

While there is no bright line rule on CEPA causation, Third Circuit courts have found a three-month or longer gap between the alleged whistle-blowing conduct and the adverse employment action insufficient to raise an inference of causation. *Choy Comcast Cable Commc'ns, Inc.*, 2012 WL 253382, at *10 (D.N.J. Jan. 26, 2012) (rejecting inference of causation in CEPA case where three months passed between alleged whistle-blowing and termination); *see also LeBoon v. Lancaster v. Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."); *accord Young v. Hobart W. Grp.*, 897 A.2d 1063, 1073-74 (N.J. Super. Ct. App. Div. 2005) (ruling plaintiff's termination four months after engaging in whistle-blowing activity did not, without more facts, suggest a causal link). But because temporal proximity is only one factor courts consider for causation, courts have refused to dismiss CEPA claims for lack of causation even when there have been three-month or longer gaps if other evidence raises an inference of causation. *See Scull*, 2012 WL 1900573, at *11-12; *see also Cahill v. Parkway Ins.,*

2005 WL 2708987, at *5 (N.J. Super. Ct. App. Div. Oct. 24, 2005) (reversing dismissal of CEPA claim even though there was a five-month gap between whistle-blowing conduct and termination because five-month delay created a factual dispute on whether plaintiff's whistle-blowing conduct motivated defendants' decision to terminate her).

Verdone's Complaint suggests a causal link between her alleged whistle-blowing conduct and her termination. Indeed, Verdone points to her termination letter written by Rice and Quattrone where they acknowledge Verdone made "allegations of fraud and harassment" against them, and that they could not let Verdone continue to communicate with the Law Firm's clients after Verdone made those accusations. [Compl. ¶¶ 150-152.] Further, both Rice and Quattrone gave conflicting reasons on Verdone's departure from the Law Firm, claiming she resigned but then stating they terminated her for misconduct. [*Id.* ¶¶ 156-163.] Those inconsistent stories may support an inference of causation. *See LeBoon*, 503 F.3d at 232-33 (explaining "inconsistencies in the employer's articulated reasons for terminating the employee" may raise an inference of causation). Thus, this Court cannot rule out the possibility the state court would find Verdone's Complaint states a CEPA claim.

In the end, Defendants have not shouldered their heavy burden to establish fraudulent joinder. *Avenatti*, 41 F.4th at 133. Because Quattrone and the Law Firm are New Jersey citizens, *see* Compl. ¶¶ 2, 5, the forum defendant rule barred Defendants from removing this action, 29 U.S.C. § 1441(b)(2).[2] Accordingly, the Court grants Verdone's remand motion.

---

[2] Because Verdone did not fraudulently join the Law Firm or Quattrone, this Court declines to decide whether Verdone fraudulently joined CTARP. Indeed, this Court only needs to find one at-home defendant before enforcing the forum defendant rule. 29 U.S.C. § 1441(b)(2).

**B. Defendants' Motion to Dismiss**

Because this Court lacks federal question jurisdiction and Defendants improperly removed this action, the Court denies Defendants' motion to dismiss. *Newton*, 2020 WL 2059954, at *3-4 (declining to address merits of defendant's motion to dismiss and denying motion after finding court lack subject matter jurisdiction).

**C. Verdone's Motion for Sanctions**

29 U.S.C. § 1447(c) authorizes courts ordering a remand to award the plaintiff "payment of just costs and actual expenses, including attorneys' fees, incurred as a result of the removal." Courts may award attorneys' fees "only where the removing party lacked an objectively reasonable basis for seeking removal." *League of Woman Voters of Pa. v. Commw. of Pa.*, 921 F.3d 378, 383 (3d Cir. 2019) (quoting *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005)). A fee award under Section 1447(c) should "deter removals sought for the purpose of prolonging litigation and imposing costs on the opposing party, while not undermining Congress' basic decision to afford defendants a right to remove as a general matter, when the statutory criteria are satisfied." *Martin*, 546 U.S. at 140. "Typically, courts award attorneys' fees where it is clear that the complaint does not state a claim removable to federal court or where minimal research would have revealed the impropriety of removal." *Bycko v. State Farm Mut. Auto. Ins.*, 2023 WL 7411752, at *8 (D.N.J. Nov. 9, 2023) (quoting *Vastola v. Sterling, Inc.*, 2022 WL 2714009, at *5 (D.N.J. Jul. 13, 2022)).

After reviewing Verdone's Complaint, the Court finds Defendants' removal not unreasonable to warrant attorneys' fees and costs. Verdone's allegations about the Retirement Agreement invited Defendants to seek removal based on ERISA preemption. Verdone's claims about the Retirement Agreement suggested Rice might have created an informal

benefit plan within ERISA's meaning.   Verdone's allegations about the Retirement Agreement satisfy several criteria courts must consider when deciding whether an employer created an informal benefit plan under ERISA.   *Woerner*, 658 F. App'x at 95.   Thus, Defendants had some basis to seek removal based on ERISA preemption.   *See Ham v. Novartis Int'l AG*, 2023 WL 7634774, at *9 n.3 (D.N.J. Oct. 17, 2023) (finding removal based on ERISA complete preemption was objectively reasonable and denying request for fees where plaintiff's complaint "could possibly be read as implicating ERISA"), *rep. and recommendation adopted*, 2023 WL 7633170 (D.N.J. Nov. 14, 2023).

That said, Defendants' removal based on diversity jurisdiction is a closer call. Based on the Complaint's face, this Court has diversity jurisdiction because Verdone is diverse from all Defendants.   [Compl. ¶¶ 1-5.]   Yet three Defendants are New Jersey citizens, and minimal research would have shown the forum defendant rule barred removal.   29 U.S.C. § 1441(b)(2).   Defendants tried to avoid the forum defendant rule by invoking the fraudulent joinder doctrine, which imposes a heavy burden.   *Avenatti*, 41 F.4th at 133.

At first glance, some of Defendants' arguments suggest Verdone's CEPA claim was vulnerable to challenge because:  (1) CEPA does not cover her supposed whistle-blowing conduct—questioning Rice and Quattrone about the Law Firm's accounting practice—under *Blackburn*; (2) Rice and Quattrone cannot be held liable under CEPA for allegedly interfering with Verdone's application for unemployment benefits; and (3) causation—that is, the three-month gap between Verdone's alleged whistle-blowing and firing does not support an inference of causation.   Those arguments may have carried the day on a Rule 12(b)(6) motion. Because Third Circuit and New Jersey caselaw offers some support for those arguments, this Court cannot say Defendants acted unreasonably by seeking removal based on diversity and

invoking the fraudulent joinder doctrine. *See Curley*, 2022 WL 445633, at *6 (denying request for attorneys' fees in CEPA case even though forum defendant rule barred removal and defendant could not establish fraudulent joinder). Going forward, however, Defendants are cautioned that a court could find that a plaintiff did not fraudulently join a party, but ultimately dismiss "the claim against that party . . . for fail[ing] to state a claim upon which relief may be granted," *Briscoe*, 448 F.3d at 217-218 (quoting *Batoff*, 977 F.2d at 852), subjecting them to sanctions. Thus, the Court denies Verdone's motion for attorneys' fees and costs.

## III. CONCLUSION

For the above reasons, the Court **GRANTS**, **in part**, and **DENIES**, **in part**, Verdone's motion to remand and for sanctions (Docket No. 10), and **DENIES** as moot Defendants' motion to dismiss (Docket No. 9). The Court remands this matter to the Superior Court of New Jersey, Law Division, Burlington County.

An accompanying Order of today's date shall issue.

**s/Renée Marie Bumb**
RENÉE MARIE BUMB
Chief United States District Judge

Dated: March 20, 2024